IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

PAMELA A. LAMB,           )
Plaintiff,                )
                          )
                          )
v.                        )        Civil Action No. 04-0750-CV-W-REL-SSA
                          )
JO ANNE B. BARNHART,      )
Commissioner of Social Security, )
Defendant.                )
                          )
                          )

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Pamela A. Lamb seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for benefits under Titles II and XVI of the Social Security Act (the Act). Plaintiff argues that the administrative law judge (ALJ) failed to properly accredit her testimony, failed to give proper weight to the opinion of her treating physician, Dr. O'Boynick, and erred by finding that she can perform other work in the economy. I find that the ALJ failed to properly accredit plaintiff's testimony, failed to rely on her treating physician's opinion, and erred by concluding that she could perform other work in the economy. Therefore, plaintiff's motion for summary judgment will be granted and the decision of the Commissioner will be reversed.

### I. BACKGROUND

This suit involves two applications made under the Act. The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq. (Tr. 446-48.) The second is an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. (Tr. 646-49.) Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under section 205.

Plaintiff's applications were denied. (Tr. 397-98, 406-09, 650.) After a hearing, an ALJ, the Honorable William G. Horne, denied benefits in a decision dated March 15, 2004. (Tr. 19-31.) The Appeals Council, denied plaintiff's request for review on June 16, 2004. (Tr. 14-16.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

1

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposition decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

Case 4:04-cv-00750-REL   Document 17   Filed 09/20/05   Page 2 of 32

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

>No = not disabled.
>Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

>Yes = disabled.
>No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

>No = not disabled.
>Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

>Yes = disabled.
>No = not disabled.

## IV.  THE RECORD[1]

### A. ADMINISTRATIVE RECORDS

**1. Earnings Statement**

Plaintiff's earnings statement reflects income for the following years:

| Year | Income |
|------|--------|
| 1969 | 258.25 |
| 1970 | 2053.16 |
| 1971 | 2767.44 |
| 1972 | 3916.84 |
| 1973 | 3394.43 |
| 1974 | 3122.24 |
| 1975 | 604.20 |
| 1976 | 5002.61 |
| 1977 | 9161.65 |
| 1978 | 9148.84 |

---

[1]The facts are largely a matter of stipulation between the parties. *See* Document No. 16, Brief for Defendant, page 2.

3

| | |
|---|---|
| 1979 | 9776.81 |
| 1980 | 10169.11 |
| 1981 | 11764.01 |
| 1982 | 11154.55 |
| 1983 | 11934.73 |
| 1984 | 12419.10 |
| 1985 | 10900.49 |
| 1986 | 11627.31 |
| 1987 | 13072.00 |
| 1988 | 12551.43 |
| 1989 | 12767.52 |
| 1990 | 12968.48 |
| 1991 | 13198.42 |
| 1992 | 12927.10 |
| 1993 | 13866.87 |
| 1994 | 13987.72 |
| 1995 | 18591.10 |
| 1996 | 20879.60 |
| 1997 | 19792.91 |
| 1998 | 20829.23 |
| 1999 | 18442.51 |
| 2000 | 6512.16 |

(Tr. 67-75.)

## 2. Third-Party Statements

On December 15, 1999, Tracy Down Welch[2], plaintiff's niece, stated that plaintiff suffers from loss of hearing, weight gain due to medication, loss of memory, difficulty breathing, and headaches. She also reported vision problems and Bell's Palsy[3] syndrome. She opined that given plaintiff's memory loss, she would have difficulty remembering instructions and directions, which would reflect on her work performance. (Tr. 95.)

On February 18, 2000, Connie Peterson, plaintiff's cousin, stated that plaintiff has difficulty with forgetfulness, gets lost, and has constant headaches. (Tr. 94.)

On March 26, 2001, an affidavit was subscribed by Karen Petree, plaintiff's supervisor at the Kansas City, Missouri Police Department, indicating that plaintiff attempted a return to work in early 2000. The Police Department attempted to accommodate plaintiff by allowing her a one-

---

[2]I have attempted, perhaps without success, to decipher the correct name on this document.

[3]Bell's Palsy is facial nerve paralysis.

4

half hour break every two hours. She was also allowed to leave work due to her health problems. When she exceeded the leave policy, she was allowed to take leave without pay, and was not penalized. In spite of these accommodations, plaintiff was not able to perform the job and resigned from the Kansas City Police Department. (Tr. 124.)

## B. SUMMARY OF MEDICAL RECORDS

On November 15, 1997, plaintiff went to emergency room (ER) at North Kansas City Hospital (NKCH) with complaints of diarrhea accompanied by bleeding. She was assessed with rectal bleeding with abdominal pain, and a history of irritable bowel syndrome[4] with hemorrhoids. (Tr. 149- 150.) On November 21, 1997, plaintiff went for a colonoscopy with biopsy. (Tr. 141.) Acute colitis[5] in the rectosigmoid area[6] endoscopically[7] consistent with pseudomembranous colitis[8] was assessed. (Tr. 142.)

On February 10, 1998, plaintiff went to NKCH for a colonoscopy with biopsy. Colonic mucosa with mild chronic nonspecific inflammation in lamina propria[9] was assessed. (Tr. 138-139.)

On May 14, 1998, plaintiff went to Gregory A. Schnell, M.D., with complaints of numbness involving her left lower extremity from the knee down to the foot. She also had some tingling of her left upper extremity and a stiff neck. She did not recall any trauma. She woke up the previous day and noticed a lenticular pattern along the latter aspect of her lower and upper leg. Plaintiff also noticed that her upper extremity fell asleep from time to time. Plaintiff also complained of chronic low back pain. (Tr. 256.)

On May 15, 1998, plaintiff returned for a second visit. She was very panicky, scared, and worried. She complained of arm pain mainly in the forearm, radiating up her shoulder and into her neck. She described a burning across her neck. She related no injury to her shoulder, neck, wrist, or elbow. Plaintiff also complained about swelling and discoloration of her left leg. She

---

[4]Irritable bowel syndrome is a functional bowel disorder characterized by cramping and diarrhea.

[5]Colitis is inflammation of the colon.

[6]The rectosigmoid area is the junction of the rectum and sigmoid colon.

[7]Endoscopy is the visual examination of the interior by use of an endoscope.

[8]Pseudomembranous colitis is a complication of antibiotic therapy that causes severe inflammation in the colon.

[9]Lamina refers to part of the brain adherent to the superior surface of the thalamus and propria is the layer of connective tissue underlying the epithelium of a mucous membrane.

5

had some headache and had taken Aleve 6 to 8 daily, for many years now at a dose above the recommended dose. (Tr. 254.) Dr. Schnell assessed tingling of the left lower extremity, consistent with possible neuropathy and a stiff neck. He also noted some mild increased, deep venous thrombosis which had to be excluded. (Tr. 255.)

On May 26, 1998, plaintiff went to NKCH for a magnetic resonance imaging (MRI) scan of the brain. The scan revealed a moderate sized abnormality along the right anterolateral margin of the pons with CSF (cerebrospinal fluid) in signal intensity on all imaging parameters and demonstrated no contrast enhancement. This possibly represented a subarachnoid or arachnoid cyst which compressed and mildly displaced the brainstem. Cystic neoplasm would be conceivable although it would be considered less likely in view of the lack of soft tissue as well as lack of enhancement. (Tr. 130-131.) A needle electromyogram (EMG) revealed evidence of mild left ulnar neuropathy with compression at the elbow. There was no evidence at this time of carpal tunnel syndrome or cervical radiculopathy on the left. (Tr. 132-133.)

On June 8, 1998, a computer tomography (CT) scan of the brain revealed an arachnoid cyst surrounding the pons, central and anterolaterally on the right. (Tr. 127.)

On June 15, 1998, plaintiff went to Paul L. O'Boynick, M.D., for consultation. She reported a one month history of left body hip esthesias and paresthesias[10]. Plaintiff also complained of general headache. A review of her MRI showed a lesion in front of the pons more off to the right. A CT scan showed a cystic lesion and this read as an arachnoid cyst. Prior to making any decision regarding surgery, Dr. O'Boynick opted to proceed with a water soluble cisternogram. (Tr. 225.)

On July 7, 1998, plaintiff was admitted to the University of Kansas Hospital (KU Medical Center) with complaints of pain in her left lower extremity since possibly May 13, 1998. She also complained of venous congestion in the legs and evidence of swollen blood vessels in her legs and of some left sided facial numbness with left upper extremity paresthesias. An MRI revealed a significant dermoid tumor near the brain stem. Plaintiff underwent tumor resection. Subsequent to surgery, she had bad nystagmus[11] and no hearing in the right ear. Plaintiff also had a right facial droop. She complained of severe nausea and vomiting and was not able to hold down any fluids. Plaintiff was started on various anti-emetics with very little effect. She experienced episodes of bradycardia[12] down to about 30-20 beats/minute; however, she did not feel any different during these episodes. Cardiology was consulted and felt this might be essential in nature due to swelling around the brain stem. Repeat MRI did not reveal any brain stem swelling; however, atropine was kept at the bedside. Plaintiff subsequently resolved from

---

[10]Paresthesias refers to neurologic symptoms which include: numbness, tingling, and hyperesthesia (increased sensitivity). Any abnormality of sensation.

[11]Nystagmus is the abnormal rhythmic movements of the eyes.

[12]Bradycardia is a heart rate that is less than 60 beats per minute.

these episodes over time. On day seven, plaintiff still had great difficulty eating and with her balance. Ophthalmology was consulted and recommended not wearing glasses and using artificial tears. A PICC (peripherally inserted central catheter) line was placed for TPN (total parenteral nutrition). Plaintiff was unable to fully maintain her normal caloric intake. However, just prior to discharge when calorie counts were maintained, she was able to take in approximately 1000 calories a day. Her caloric intake should have been approximately 1800 calories/day. Plaintiff was sent home on TPN. At the time of discharge, she was not vomiting nearly as frequently as previously, but her hearing was still out on the right side and she had not really recovered any significant facial movement on the right side. She was able to close her eyes, however, but not close the right eye all the way. She did have a corneal blink on that side but did not have any numbness on the right. Plaintiff planned to stay at various friends' houses where she would receive extra care. She was discharged on July 25, 1998, and discharge diagnoses included an epidermoid tumor[13], right hearing loss, nystagmus[14], right cranial nerve seven palsy, and central nervous system hyperemesis[15]. (Tr. 156-157.)

On August 26, 1998, Thomas R. Sanford, M.D., of KU Medical Center, noted plaintiff continued to experience unstableness and frequent bouts of vertigo that caused nausea. Dr. Sanford noted this would likely take a number of weeks to months to resolve, as plaintiff was on a number of anti-inflammatory medications status post surgery. If her problems persisted, he recommended vestibular rehabilitation. In addition, if plaintiff's facial nerve recovery was slow with ophthalmic difficulty, Dr. Sanford recommended temporary gold weight placement in her eyelid to better protect her eye. (Tr. 297.)

On September 14, 1998, plaintiff went with complaints of occasional diplopia[16]. (Tr. 222.)

On October 5, 1998, plaintiff went to KU Medical Center for a follow up. She continued to improve, status post resection of CP angle dermoid tumor[17]. The nausea and dizziness should continue to improve as visual defect resolves. (Tr. 221.)

---

[13]Epidermoid tumor is a closed sac within the tissue containing oily or fatty semi-solid material.

[14]Nystagmus is an abnormal rhythmic movement of the eyes generally pronounced on extreme lateral gaze.

[15]Hyperemesis is excessive vomiting.

[16]Diplopia is double vision.

[17]Dermoid tumor is a collection of cancerous cells which forms cysts that contain one or more of the three primary embryonic germ layers: skin, hair, or teeth.

7

On January 17, 1999, plaintiff went to the ER at KU Medical Center with complaints of headache and double vision. (Tr. 216.)

On January 17, 1999, plaintiff went for a consultation with ophthalmology. Intermittent diplopia over seven months time since dermoid cyst removal and optic disc swelling were assessed. (Tr. 219, 371.)

On January 19, 1999, plaintiff went for a CT scan of the head. The scan revealed an enlarged and dense basilar artery[18] raising the question of thrombosis or aneurysm to this vessel and further evaluation was recommended. (Tr. 230-231.)

On January 26, 1999, plaintiff returned to the ophthalmology department at KU Medical Center complaining of some double vision with worsening dizziness. Intermittent diplopia and optic disc swelling were assessed. An MRI of the head and MRA were recommended. (Tr. 370.)

On January 27, 1999, plaintiff went to KU Medical Center for follow up on the dermoid resection. She complained of ongoing headache and recent double vision, general malaise, and mild temperature elevations. Status post dermoid resection was assessed and MRI/MRA was recommended. (Tr. 220.)

On January 28, 1999, plaintiff returned for follow up. She complained of headaches, blurred vision bilaterally and dizziness. She received a spinal tap.[19] (Tr. 213.)

On February 3, 1999, plaintiff was admitted to KU Medical Center. She previously went to the ER with a history of headache and nausea since the first of the month. Plaintiff received a lumbar puncture in the neurosurgery clinic, after which she had a mild headache. Following her admission, a consultation was made for infectious disease and neurology. Another CSF fluid removal was requested. The neurology team felt the findings in the lumbar puncture were consistent with a reactive process, possibly an arachnoiditis;[20] however, they felt meningitis or an infectious process was not likely. They recommended treatment for pain relief. Plaintiff was discharged on February 4, 1999, and discharge diagnoses included headache and status post lumbar puncture. (Tr. 160-161.)

---

[18]Basilar artery supplies the pons and gives rise to the vertebral arteries; provides branches to cerebrum and cerebellum.

[19]Spinal tap is a diagnostic procedure in which a sterile needle is introduced into the lower spine (L2) to collect cerebrospinal fluid for diagnostic purposes.

[20]Arachnoiditis is the inflammation of the arachnoid membrane and adjacent subarachnoid space.

8

On February 23, 1999, plaintiff went to ophthalmology at KU Medical Center complaining of constant diplopia which improved but returned the previous night following a vomiting episode. She reported ongoing headaches and some swelling. Status post resection of post fosse dermoid with intermittent diplopia, improved and optic disc swelling with probable improvement were assessed. (Tr. 368.)

On March 10, 1999, plaintiff went to the infectious disease clinic KU Medical Center for follow up of diagnosed chemical meningitis. She continued to experience consistent headache, fatigue, and intermittent blurred vision. Plaintiff suffered halous[21] at night, and double vision peripherally during stress. Physical examination revealed right facial weakness, positive for nystagmus[22] and right hearing loss. Her extremities showed +1 non-pitting edema bilaterally in the lower extremities and below the knee. (Tr. 210.) Chemical meningitis due to epidermoid cyst removal was assessed. She was advised to follow up with neurosurgery for an MRI. (Tr. 211.) On this same day, plaintiff went to the neurosurgery clinic complaining of continued blurred vision with double vision in her peripheral fields. Physical examination revealed ongoing headache with no improvement since hospitalization. Plaintiff also complained of severe hot flashes and general malaise. (Tr. 213.) Obtaining an MRI was recommended. (Tr. 212.)

On March 23, 1999, plaintiff went to ophthalmology at KU Medical Center complaining of her eye swelling shut and worsening headaches subsequent to taking Prednisone.[23] She reported her diplopia "comes and goes." (Tr. 366.) On March 24, 1999, plaintiff reported a new complaint of extremity pain that started about one week prior. Her fatigue and headaches remained unchanged. (Tr. 212.)

On April 14, 1999, plaintiff went to the endocrine clinic at KU Medical Center status post epidermoid tumor. She complained of constant headache, double vision when tired, and weight gain. (Tr. 208.) Physical examination revealed right EOMI (extraocular muscles intact) reaction less to accommodation. (Tr. 209.)

On April 15, 1999, R. Neil Schimke, M.D., of KU Medical Center noted plaintiff had good evidence of underlying polycystic[24] ovary disease which gave rise to hirsutism[25] and acne.

---

[21]I believe this refers to a halo effect, i.e., a flare of light surrounding a luminous body.

[22]Nystagmus is the abnormal rhythmic movements of the eyes generally most pronounced on extreme lateral gaze.

[23]Prednisone is in a class of drugs called steroids used to treat many disorders including arthritis, lupus, severe psoriasis, asthma, and colitis.

[24]Polycystic means many cysts.

[25]Hirsutism is excessive hair growth.

9

From the perspective of her central nervous system, Dr. Schimke could not offer an explanation for the enhancing lesions. (Tr. 206.)

On April 27, 1999, plaintiff returned to the ophthalmology department complaining of "occasionally having her visual acuity getting blurry, depending on stress." She reported problems sleeping. Papilledema,[26] improving mildly and improving vertical diplopia were assessed. (Tr. 364.)

On May 12, 1999, plaintiff went to Dr. O'Boynick complaining of headache and neck pain. A disc exam revealed some persistent disc blurring. Dr. O'Boynick scheduled an MRI scan. (Tr. 205.)

On June 7, 1999, an MRI of the head revealed findings of a mild enlargement of a bilobed peripontine mass in the anterior and to the right of the pons.[27] This did not have the typical imaging characteristics of epidermoid and possibly represented a dermoid of meningioma.[28] Clinical correlation was recommended. (Tr. 239-240.)

On June 9, 1999, plaintiff returned to Dr. O'Boynick complaining of headache and diplopia. A repeat MRI showed an enlargement of the lesion around the basilar apex and brain stem. The possibility of biopsy versus resection was discussed. (Tr. 205.)

On July 8, 1999, plaintiff was admitted to KU Medical Center with complaints of double vision and headache since the time of her previous surgery with worsening of these symptoms since February. She had undergone MRI evaluation of her brain revealing a subtemporal mass on her right side. For this reason, she was taken to the operating room where she underwent right subtemporal craniotomy with resection of subtemporal mass and biopsy. (Tr. 168, 175, 178.) Initially, postoperatively, plaintiff had some confusion which resolved over the course of her admission. In particular, her memory was noted to be decreased. Rheumatology consultation was also obtained in the event that any further ideas might exist as to how to decrease the amount of inflammation present from the reaction within the brain to the epidermoid tumor. As plaintiff's mental status was now improved with improved memory and her ambulation was approaching a normal postoperative state and was treatable with home physical therapy, the decision was made to discharge her to her home on July 19, 1999. Her final diagnosis was epidermoid intracranial tumor with inflammatory response. (Tr. 168.)

---

[26]Papilledema is edema or swelling of the optic disc resulting in loss of definition of the optic margin on ophthalmoscopic examination.

[27]Pons is a rounded eminence off the ventral surface of the brainstem. The origins of cranial nerves V, VI, VII, and VII are at the border of the pons.

[28]Meningioma is a common benign brain tumor that arises from the pia-arachnoid cells of the meninges.

Case 4:04-cv-00750-REL   Document 17   Filed 09/20/05   Page 10 of 32

On August 9, 1999, plaintiff went to KU Medical Center status post ER visit four days prior. She previously complained of angina, cystitis, and asthma. Her headaches continued, beginning frontally and behind the eyes with nausea. Her vision was occasionally blurry with double vision and she experienced chronic insomnia. An examination revealed a decreased sensation to touch, numbness and tingling on the right side of her face. There was right side palsy, and plaintiff's right eardrum was destroyed during surgery with complaints of tinnitus.[29] (Tr. 204.)

On August 25, 1999, plaintiff complained of a second episode of angina two days prior. She did not seek medical advice at that time. She was to follow up with her primary care physician in five days. (Tr. 203.) Plaintiff also went to the ophthalmology department complaining of a headache that would not go away and with decreasing her visual acuity. Status post fosse dermoid cyst resection in July 1998, a history of papilledema and no change since prior visit were assessed. (Tr. 360.)

On August 27, 1999, plaintiff went to the ER at KU Medical Center complaining of a headache with nausea. An examination revealed decreased sensation on the right side of face, deafness in the right ear, and double vision. Plaintiff was diagnosed with increased inflammation of postoperative site and was started on Decadron[30]. A headache was assessed. (Tr. 199-200.)

On August 28, 1999, a CT of the head revealed a near complete resolution of post surgical edema in the right temporal horn. (Tr. 237-238.)

On August 31, 1999, plaintiff went to Kenneth Mann, M.D., status post epidermoidcyst removal from her brain stem. Dr. Mann indicated plaintiff had made a fairly good recovery. Her balance had improved. She was able to walk without a cane now. However, her exercise tolerance was quite poor. Plaintiff reported suffering headaches. If she reduced her Decadron dose, her headaches returned. Plaintiff also experienced easy bruising. Dr. Mann noted plaintiff's vision was improving. Plaintiff wondered whether to go on disability. Dr. Mann indicated it would probably be necessary since her job at the police department consisted of working on computers and talking on the telephone and she currently had severe balance problems, visual tracking problems, and absent hearing from her right ear along with right central $7_{th}$ weakness. Dr. Mann assessed a brain tumor, epidermoid cyst resected from brain stem on July 1998 and again in July 1999, with residual $7_{th}$ and $8_{th}$ nerve sections and non-functioning on the right side, balance disturbance, hearing loss and facial paralysis. He also assessed asthma, seemingly fairly stable, and chronic steroid therapy. (Tr. 248-249.)

On September 14, 1999, plaintiff went to the ophthalmology department at KU Medical Center complaining of blurred vision. Fundus photos were recommended and a new prescription was written. (Tr. 188.)

---

[29]Tinnitus is ringing or buzzing in the ears.

[30]Decadron is a steroid that reduces swelling and decreases the body's immune response.

11

On September 22, 1999, plaintiff went to the neurosurgery clinic at KU Medical Center. She reported fatigue and increased synope[31] over the past two weeks. Plaintiff also complained of increased loss of memory. (Tr. 198.)

On October 20, 1999, an MRI of the head revealed a parapontine mass and differential considerations for this finding including meningioma, lymphoma, schwannoma, or granulomatous process.[32] (Tr. 235-236.)

On November 9, 1999, plaintiff went to the ophthalmology clinic complaining of blurry vision and a constant headache. She was advised to follow up with neurosurgery to evaluate for shunt placement due to persistent papilledema and to try and alleviate need for further steroid use. (Tr. 187.)

On November 11, 1999, plaintiff went to Dr. Mann for follow up. She reported only doing fair and discussed the possibility of additional surgery. Plaintiff reported undergoing shunt placement because of the cyst at her brain stem which still caused problems. Dr. Mann noted plaintiff apparently suffered optic nerve head pressure. She reported waking up the previous weekend with severe pain in her right wrist. It was swollen and warm and erythmatous and had gradually improved since that time, but some soreness remained. Plaintiff also reported some small scattered skin lesions. She experienced a little bit of shortness of breath, and her mother noted she heard plaintiff breathing whenever she made any particular efforts. She used her inhaler, Ventolin, on a very intermittent basis, once a week or less. Plaintiff reported she had been unable to work since May. Objectively, plaintiff had a warm, tender right wrist, on the dorsum of the wrist. (Tr. 246.) Dr. Mann assessed probable inflammatory arthropathy which may have been unmasked during steroid taper, and cystic lesion in her brain, previously resected, but still with increased central nervous system pressure. He indicated plaintiff might need a shunt procedure done fairly soon. (Tr. 245-246.)

On December 15, 1999, plaintiff went to Dr. O'Boynick for re-evaluation. Dr. O'Boynick noted plaintiff continued to experience chronic papilledema and enlarged ventricles. He recommended a ventricular peritoneal (VP) shunt. Dr. O'Boynick also noted plaintiff underwent a previous resection of an epidermoid tumor and a re-operation which showed predominately granulomatous changes around the base of the brain. (Tr. 196.)

On January 4, 2000, plaintiff was admitted to KU Medical center with papilledema and headache and memory loss. She underwent a right frontal VP (venous pressure) shunt for hydrocephalus. She was discharged on January 7, 2000, with a final diagnosis of hydrocephalus. (Tr. 191.)

---

[31]Synope is fainting.

[32]Granulomatous is an inherited disorder transmitted as a sex-linked recessive gene. In this disease, there is an inability of white blood cells to engulf and kill certain bacteria and fungi that gain access to the body.

12

On January 26, 2000, plaintiff went to Dr. Mann status post VP shunt because of papilledema and hydrocephalus. Since discharge, plaintiff developed a little bit of breakdown of the abdominal incision. In addition, she continued to complain of arthritic discomfort with a lot of pain in her hands and feet. Plaintiff was taking Dexamethasone[33] daily because of her papilledema, and she did not think her condition had changed significantly. The medication also failed to relieve her hand pain. Physical examination revealed tenderness on ROM (range of motion) and evidence of mild synovitis in her hands, especially at the MCP (metacarpophalangeal) and PIP (proximal interphalangeal) joints. Dr. Mann assessed inflammatory arthropathy, status post VP shunt, with possible cellulitis of the peritoneal shunt wound, and a history of chronic steroid therapy. (Tr. 244.)

On February 23, 2000, plaintiff went to the neurology department at KU Medical Center complaining of a headache. The headaches were bilateral, frontal, dull in quality, moderate to severe in intensity, and were associated with photophobia,[34] nausea and vomiting on occasion. Resting in a dark quiet room often provided relief. Plaintiff's headaches occurred all day, everyday. The headaches were not worse or better in the morning or the afternoon. The headaches were not necessarily made worse with stress or concentration. On neurological examination, plaintiff demonstrated a right-sided peripheral 7th nerve palsy. She also had hypesthesia in the V1 to 3 distribution on the right. She exhibited conductive hearing loss on the right side. She was assessed with a headache, probable migraine headache. It was noteworthy that the character, frequency, and intensity of the headaches were the same now as they were prior to any of the neurosurgical procedures. A low dose of Elavil[35] was prescribed. (Tr. 284-286.)

On February 29, 2000, plaintiff went to Robert Pulcher, Ph.D., for a psychological consultation at the request of the state agency. The tests administered included a psychological consultation and the Wechsler Memory Scale-Revised (WMS-R). During the mental status examination, plaintiff was oriented to time, person, place and situation with a slightly anxious mood. (Tr. 278.) Plaintiff reported undergoing three brain surgeries and was placed on medical leave in June 1999. On the WMS-R, plaintiff's Index Scores included verbal memory 86, visual memory 81, general memory 83, attention/concentration 81, and delayed recall 88. Her Index Scores were somewhat comparable to IQ scores on the Wechsler Adult Intelligence Scale-Revised (WAIS-R) . (Tr. 279.) On the WAIS-R, an IQ score of 100 is considered average or normal. Plaintiff's Index Scores did not show profound memory loss. Her Index Scores on the WMS-R placed her at slightly above the Borderline Intellectual Category of intelligence if compared to the WAIS-R, and this would be true of her placement in memory ability. Her scores

---

[33]Dexamethasone is the generic name for Decadron, a steroid used to reduce swelling that causes a decrease in the body's immune function.

[34]Photophobia is an inability to expose eyes to light.

[35]Elavil is the trade-name drug for the generic amitriptyline and is used as an antidepressant.

Case 4:04-cv-00750-REL   Document 17   Filed 09/20/05   Page 13 of 32

showed little variation, with all of them being in the 80's. However, in Visual Memory she had one of her lowest Index Scores, 81 probably due in part to her vision impairment. Plaintiff also had an Index Score of 81 on Attention/Concentration. She reported difficulty focusing and concentrating at times. Plaintiff obtained her highest Index Score of 88 in Delayed Recall which probably indicated she could handle information which was not immediately demanded of her. She would be able to handle many tasks most employment would require, but it was doubtful she could work as a 911 operator and handle the stress and many tasks she would have to do in rapid succession. Plaintiff reported constant headaches might make it difficult for her to remember some things in her daily living routine. Dr. Pulcher concluded the results of the consultation and testing appeared to show plaintiff did not suffer profound memory loss at this time. She operated at the low average level of intelligence as reflected in her WMS-R scores. Plaintiff probably would not be able to return to the job she formerly held, that of a 911 operator. She reported physical symptoms which, if valid, would make it very difficult for her to hold full time employment at this time. Dr. Pulcher further noted plaintiff undoubtedly suffered some side effects from her medications, especially those of a steroidal nature. He indicated plaintiff appeared to have a strong work ethic and reported being anxious to return full time as soon as possible. Dr. Pulcher diagnosed apparently low average intellectual and memory functioning and a history of multiple brain surgeries. (Tr. 280.)

On March 1, 2000, Dr. O'Boynick indicated on a questionnaire that plaintiff could sustain a 40-hour workweek on a continuous basis based on subjective restrictions. (Tr. 283.)

On March 8, 2000, Craig S. Lofgreen, M.D., reexamined plaintiff for return to work purposes. Plaintiff had been released to work by her surgeon. Plaintiff reported previously working in the "alarm office" performing typing and clerical work. She was unsure whether she could tolerate long hours of typing or staring at the screen. Plaintiff complained of some double vision in certain portions of her visual field and occasional problems getting lost when driving an unfamiliar route. She suffered significant weight gain due to the use of cortisone which she discontinued. Her current medications include Elavil. Dr. Lofgren noted plaintiff was obese and cushingoid. She had a frontal scar and two scars on the right posterior neck as well as one on the right upper abdomen consistent with a shunt. General physical examination was otherwise unremarkable. A mini mental status examination indicated her disability to do mathematic calculations. Plaintiff doubted this would be a problem since she used a calculator in her previous job. Dr. Lofgreen indicated plaintiff could probably tolerate some degree of data entry work and recommended an alternative non-data entry activity for 30 minutes out of every two-hour-time period. Her problems with recurrent headaches and double vision might predispose her to eye complaints or worsening of headache and therefore, he recommended non-data entry activity for 30 minutes out of every two hour period. (Tr. 337.)

On April 10, 2000, plaintiff went to Karen Hutton-Rotert, R.N., FNP (family nurse practitioner) complaining of increased low back and coccyx[36] pain. She recently returned to work sitting at a computer for an eight hour day. Since returning to work and sitting for this length of

---

[36]Coccyx is the last bone of the spinal column just below the sacrum.

time, plaintiff reported increased pain. She denied experiencing discomfort while off work over the weekend. The discomfort resolved with standing or lying down. Hutton-Rotert assessed low back pain and coccyx pain with extended sitting and obesity. Plaintiff was instructed to obtain an inflatable donut for sitting and was also encouraged to stand periodically and ambulate during her work day. (Tr. 637.)

On April 17, 2000, plaintiff returned complaining of lumbosacral and coccyx discomfort after a fall on the previous day. (Tr. 634.) A lumbar spine x-ray revealed mild degenerative changes at T11-12. (Tr. 636.) Hutton-Rotert assessed lumbar/coccyx contusion, obesity, post craniotomy, and inflammatory arthropathy. (Tr. 634.)

On April 18, 2000, lumbar x-rays showed only mild degenerative changes at the T11-12 levels. (Tr. 636.)

On April 19, 2000, plaintiff went to Charles DeCarli, M.D., in the neurology clinic at KU Medical Center for follow up evaluation of her headache disorder. She reported a chronic headache disorder and an epidermoid tumor that was resected in July 1999. The headache disorder began before epidermoid was diagnosed and remained unchanged since the diagnosis and treatment of the epidermoid. Plaintiff related suffering a continuous daily headache throbbing at the back of the neck radiating to the forehead. Amitriptyline (Elavil) was helpful but caused overwhelming fatigue. Because of intolerable side effects to Amitriptyline, Dr. DeCarli prescribed Nortriptyline.[37] He suspected there is a component of stress and possibly depression underlying the headache disorder. (Tr. 519.)

On May 3, 2000, plaintiff went to Dr. Mann complaining of feeling acutely ill. Examination showed the left tympanic membrane[38] was markedly erythmatous with some slight decrease in red reflux and mild retraction. Dr. Mann assessed acute otitis media[39] on the left and viral upper respiratory tract infection. (Tr. 633.)

On May 23, 2000, plaintiff went to the ophthalmology department at KU Medical Center for follow up. Status post dermoid cyst resection (July 1998) with chronic increased intercranial pressure (ICP) and papilledema due to VP shunt were assessed. (Tr. 348.)

On August 28, 2000, an MRI of the head revealed slight decrease in the globular most cephalic portion of the mass. The differential considerations included meningioma or granulomatous disease and there was a resolution of hydrocephalus following VP shunt tube placement. (Tr. 566-567.)

---

[37]Nortriptyline is an antidepressant.

[38]Tympanic membrane is the eardrum.

[39]Otitis media is an infection and inflammation of the middle ear space and ear drum.

On September 5, 2000, plaintiff went to Nurse Hutton-Rotert complaining of nasal and sinus congestion with yellow rhinorrhea. Hutton-Rotert assessed acute sinusitis, headaches, irritable bowel syndrome (IBS), and asthma. (Tr. 631.)

On October 4, 2000, plaintiff returned to Nurse Hutton-Rotert with complaints of increasing constipation. She also complained of a constant heaviness and fullness sensation in her chest. Plaintiff noted some mild shortness of breath. She felt the discomfort was worse with deep inspiration[40]. Plaintiff further reported trouble sleeping and complained of fatigue. She also noted low back pain. Nurse Hutton-Rotert suspected plaintiff's symptomatology was primarily related to gastroesophageal reflux disease (GERD). (Tr. 630.)

On December 1, 2000, plaintiff went to Dr. Mann with complaints of sinusitis symptoms with nasal congestion. Examination revealed a little tenderness over her left maxillary region and some evidence of mild obstruction on the left side. Dr. Mann assessed sinusitis, probably left maxillary. (Tr. 628.)

On December 6, 2000, Dr. O'Boynick noted plaintiff had an ongoing neurosurgical problem. She had been operated on twice for an epidermoid tumor involving the basal structures of the brain and cranial nerves. In addition, plaintiff developed hydrocephalus and needed a VP shunt. Dr. O'Boynick indicated this would be an ongoing problem and it would be difficult for plaintiff to work a full time job because of visual difficulty and headache. He did not envision plaintiff's condition would improve with either time or any additional type of therapy. (Tr. 339.)

On December 8, 2000, plaintiff went to Dr. Schnell for follow up of her IBS. She admitted to experiencing a lot of stress in her life and noted increased symptoms during times of stress. Dr. Schnell assessed IBS, diarrhea predominate but alternating with constipation. (Tr. 627.)

On December 27, 2000, plaintiff went to Dr. Mann complaining of nasal and sinus congestion with yellow rhinorrhea as well as a cough productive of yellow sputum. Examination revealed mildly tender sinuses over the maxillary sinus region bilaterally. Nares were congested without rhinorrhea. Dr. Mann assessed febrile illness and acute sinusitis. (Tr. 624.)

On March 19, 2001, the ophthalmology department at KU Medical Center noted plaintiff suffered from bilateral chronic optic nerve edema secondary to chronic intra cranial pressure (ICP) from a history of having a dermoid cyst in her brain. Her vision acuity was 20/20 in both eyes with correction, and her visual field testing was within normal limits. She complained of problems with intermittent blurred vision that was problematic in patients with bilateral optic nerve edema. (Tr. 503.)

_____

[40]Inspiration means to breathe in.

On March 19, 2001, Jerry B. Wurster, M.D., noted that plaintiff's vision was 20/20 in both eyes with correction, and her visual fields testing was within normal limits. He observed that plaintiff had been complaining of blurred vision that comes and goes, which can be a problem with patients with bilateral optic nerve edema. (Tr. 503.)

On April 2, 2001, plaintiff went to Dr. Mann with complaints of sore throat, headache, and some wheezing. Her chest felt tight at times and she had a fever-like sensation. Examination revealed a mild degree of erythema of the oropharynx. Dr. Mann assessed upper respiratory infection and pharyngitis. (Tr. 620.)

On May 29, 2001, plaintiff returned to Dr. Mann with complaints of allergy type symptoms. She noted some nasal congestion and clear rhinorrhea as well as sneezing, itchy, watery eyes, and itching of her ears. Examination revealed nares slightly congested. Dr. Mann assessed allergies and stable asthma. (Tr. 616.)

On June 22, 2001, plaintiff went to Dr. Mann complaining of head congestion, generalized fatigue, and a hoarse voice. Her symptoms had been present for about five days. She had not felt bad other than a little bit of a sore throat and noticed a lot of drainage. Dr. Mann assessed upper respiratory infection with laryngitis and pharyngitis. (Tr. 615.)

On June 26, 2001, plaintiff went to the ophthalmology department at KU Medical Center with complaints of persistent headaches. Chronic increased ICP, papilledema secondarily and VP shunt placement were assessed. (Tr. 502.)

On July 2, 2001, an MRI of the head revealed a postsurgical changes of a right temporooccipital craniotomy with encephalomalacia and atrophy along the inferior right temporal lobe; a right frontal shunt tube with a focal area of round encephalomalacia in the body of the corpus callosum; and a linear area of enhancement along the right pons and mid brain decreased in prominence in the previous study and probably postsurgical in nature. (Tr. 560-561.)

On July 6, 2001, plaintiff went to Dr. Mann with a somewhat difficult visit. She was mainly frustrated with the neurological problems encountered. Plaintiff wanted to get another opinion as to "whether I should have had the surgery at all." Dr. Mann noted that if she wanted to go to the Mayo Clinic, he would make arrangements. (Tr. 614.)

In a letter dated July 25, 2001, Dr. Mann noted plaintiff had an epidermoid cyst in the brain near her ocular motor nerve nucleus. She had undergone two surgeries for resection and a third surgery for placement of a VP shunt. He indicated that plaintiff continued to experience difficulties with head pain, occasional diplopia, facial nerve weakness, and papilledema. In addition, she suffered asthma under treatment with Montelukast[41] and an inflammatory

---

[41]Montelukast is a leukotriene inhibitor used to prevent asthma attacks.

arthropathy. Plaintiff also had a history of GERD,[42] sinusitis, and she was overweight. Dr. Mann concluded plaintiff needed a thorough evaluation and at the Mayo Clinic. (Tr. 612.)

On September 28, 2001, plaintiff went to Dr. Mann with complaints of nasal congestion. She requested medication. (Tr. 611.) On November 13, 2001, plaintiff went to the ophthalmology department at KU Medical Center with complaints of headaches and eye strain. Chronic increased ICP and papilledema secondarily were assessed. (Tr. 499.)

On December 1, 2001, plaintiff went to Dr. Mann complaining of congestion and cough. Dr. Mann assessed sinusitis and bronchitis. (Tr. 609.)

On December 10, 2001, plaintiff went to KU Medical Center for a neurological examination. She was referred because her headaches had never resolved. They were unchanged in character or severity, 5-7/10, continuous, all day every day, in the bilateral occipital. (Tr. 511.) The examination revealed positive findings in the right peripheral $7_{th}$ and hypesthesia of the right V1-3. (Tr. 513.) Headaches were assessed, and Nortriptyline was prescribed. Plaintiff was advised to continue taking Advil. (Tr. 514.)

On December 21, 2001, plaintiff went to Dr. Mann with some upper respiratory tract infection symptoms present for about four days. Plaintiff had a runny nose and had taken a few decongestants without much help. She had a mild sore throat and a mild non productive cough without dyspnea or pleurisy and no wheezing. Dr. Mann assessed an upper respiratory tract infection, viral in nature. (Tr. 608.)

On January 7, 2002, an MRI re-demonstrated post surgical changes of right craniotomy with encephalomalacia and atrophy involving the inferior right temporal lobe. A re-demonstrated right frontal shunt tube was also noted with a slight interval decrease in the previously described linear enhancement along the right pons and mid brain. (Tr. 557-558.)

On January 7, 2002, an MRI scan showed postsurgical changes of right craniotomy and right frontal shunt tube, but there were no definite masses, and only a slight interval decrease in the linear enhancement along the right pons and mid-brain. (Tr. 558.)

On January 11, 2002, plaintiff went to Dr. Mann for follow up. He noted plaintiff had not gone back to the Mayo Clinic to check up on her central nervous system surgery sites. A previous MRI showed a smaller epidermoid cyst. Plaintiff reported no new symptoms of diplopia or change in hearing. She continued to have absent hearing from her right ear and roaring tinnitus with rare episodes of vertigo. Dr. Mann assessed current upper respiratory tract infection, probably viral, epidermoid cysts in the central nervous system with residual right $8_{th}$ nerve and $7_{th}$ nerve weakness, and controlled asthma. (Tr. 607.)

---

[42]GERD stands for gastroesophageal reflux disease.

18

On January 25, 2002, an EMG (electromyogram) revealed findings consistent with mild bilateral carpal tunnel syndrome. Plaintiff complained of progressive bilateral hand numbness and right upper extremity (RUE) numbness since her first surgery. (Tr. 509-510.)

On January 25, 2002, an EMG showed no evidence of right cervical radiculopathy, and the findings were consistent with "mild" bilateral carpal tunnel syndrome. (Tr. 510.)

On May 8, 2002, plaintiff went to KU Medical Center complaining of bilateral head numbness, worse at night. A previous EMG revealed mild bilateral carpal tunnel. Splints were recommended. Plaintiff refused surgery at this time. (Tr. 552.)

On May 17, 2002, a CT of the head revealed no evidence of shunt malfunction. (Tr. 553-554.)

On June 25, 2002, plaintiff went to Dr. Mann with urticaria[43] for the past 4 or 5 days. It started in her chest and had gradually spread up her neck and to her upper arms. Plaintiff reported taking more Ibuprofen than usual. Dr. Mann assessed acute urticaria etiology unknown. (Tr. 605.)

On July 11, 2002, plaintiff returned to Dr. Mann for follow up. He assessed stable asthma, a history of stable nummular eczema, status post VP shunt for epidural brain tumor and a resultant stable right Bell's palsy. (Tr. 601.)

On October 11, 2002, plaintiff went to Dr. Mann with an acute viral upper respiratory tract infection symptoms now for about 24 hours. She had a congested nose and hoarse throat which was slightly sore. Dr. Mann assessed viral upper respiratory infection, and a subarachnoid cyst. (Tr. 595.)

On January 13, 2003, plaintiff went to Dr. Mann with symptoms of a back strain. She had picked up her mother who had fallen. She experienced some left lumbar pain and pain radiating up into her shoulder. Examination revealed very mild facial weakness, on the right with some improvement. Dr. Mann assessed acute lumbar strain, stable asthma, GERD, epidermal cyst of the $3_{rd}$ ventricle, treated surgically and subsequent VP shunt, and marked overweight. (Tr. 594.)

On February 3, 2003, plaintiff went to KU Surgery Association with complaints of continuing headache and diplopia, and hand numbness. (Tr. 552.)

On August 1, 2003, plaintiff went to Dr. Mann with several complaints. She reported episodes of hives when under a great deal of psycho-social stress, suffered in the last few weeks. Plaintiff also reported that her mother was bedridden with progressive dementia. Plaintiff received two visits from the Division of Aging, and she was in conflict with them over several issues including whether she (plaintiff) was "suicidal" and whether she was taking adequate care

_____

[43]Urticaria is a hive-like rash that is usually a manifestation of an allergy.

Case 4:04-cv-00750-REL   Document 17   Filed 09/20/05   Page 19 of 32

of her mother. A review of her systems revealed plaintiff was still overweight and had central 7th palsy related to a previous surgery on the right. Plaintiff also experienced a lot of irritable bowel symptoms with overactive bowels. (Tr. 584.) Dr. Mann assessed abdominal pain associated with diarrhea and sometimes right upper quadrant pain post prandially; could be IBS. A history of IBS, status post VP shunt, status post removal of a 3rd ventricle epidermoid cyst and asthma. (Tr. 585.)

On September 12, 2003, plaintiff returned to Dr. Mann complaining of ongoing irritable bowel syndrome problems. She also complained of "black outs" probably a pre-syncope feeling, attributed to her previous head surgery. Plaintiff was neurologically intact except for very mild right facial weakness. Dr. Mann assessed IBS, possible para-epileptic syndrome, and a previous epidermoid cyst resection from her 3rd ventricle. (Tr. 641.)

On November 17, 2003, plaintiff went to Dr. Mann complaining of a sore throat over the past five days. On examination, Dr. Mann felt plaintiff's shunt from her epidermoid cyst down to the peritoneal area as it coursed through the right side of her neck. He assessed upper respiratory infection with probably viral pharyngitis. (Tr. 640.)

On January 22, 2004, Dr. Mann completed a Physician's Source Statement (Physical) on plaintiff. He indicated plaintiff could lift/carry on an occasional and/or frequent basis less than 10 pounds. She could stand and/or walk with normal breaks for less than two hours. Plaintiff could sit with normal breaks for less than about six hours. Dr. Mann indicated these assessments were supported by medical findings including status post resection of mid brain craniopharyngion with residual balance and hearing deficits. (Tr. 638-639.)

### C. SUMMARY OF TESTIMONY

**1. First Administrative Hearing (March 13, 2001)**

#### Testimony of Pamela A. Lamb

Plaintiff testified at her first hearing on March 13, 2001. She reported that she was 37 years old at the time, had three years of college, no military service, and attended airline school. (Tr. 664.)

Her last day of work was April 21, 2000, for the Kansas City Police Department, where she was working in the alarm administrator's office. (Tr. 665.) She left work because of headaches. (Tr. 665.) She would work five days a week, eight-hours a day with a 30 minute break every two hours. (Tr. 666.) This restriction was imposed by the police department's doctor. (Tr. 666.) She would normally get a 30-minute to an hour lunch break. (Tr. 670.)

Plaintiff was diagnosed with a brain tumor on April 7th of 1998. (Tr. 675.) Her first surgery was on July 7, 1998. (Tr. 676.) From June 1998 until the Fall of 1998, plaintiff was off work. (Tr. 675.) She returned to work in September or October 1998, on limited duty. (Tr. 676.) Although her examining doctor released her without restrictions, the police department

placed plaintiff on limited duty. (Tr. 677.)

In June 1999, plaintiff had her second surgery and then was placed on limited duty but was off work for "practically the entire year." (Tr. 674; 678.)

Plaintiff indicated that she has undergone a third surgery on her brain. (Tr. 713.) The doctors put a shunt into her brain to relieve the fluid that causes pressure on the optic nerve. (Tr. 721.)

In March 2000, plaintiff was released by to work and returned to limited duty at the alarm administrator's office. (Tr. 679.) On April 21, 2000, she told the police department that she could not continue to work and she resigned her position. (Tr. 679.)

Plaintiff reported living with her mother and living off her mother's social security retirement income. (Tr. 681.)

Plaintiff reported that her headaches are constant, and although she takes Excedrin it does nothing to relieve the pain. (Tr. 692.) Plaintiff reported that she has seen a specialist, a neurologist, but she has not experienced any relief because she is allergic to the prescribed medication (e.g., Nurotin). (Tr. 693.) She indicated that her headaches get worse when she is under pressure. (Tr. 713.)

Plaintiff has gone to the emergency room for her headaches and received shots, but they just made her sleep. (Tr. 694.) She did not make a habit of going to the emergency room for her headaches because she could not afford it. (Tr. 695.)

Plaintiff indicated that she suffers from irritable bowel syndrome, which has gotten worse. (Tr. 718.) She would experience this problem about once or twice a month. (Tr. 720.)

Plaintiff reported having passed the state driver's test, including the vision test. (Tr. 696-97.)

As to daily activities, plaintiff reported that she helps care for her mother who has Alzheimer's Disease and seizures. (Tr. 702.) She cooks, does laundry and shops. (Tr. 702.) She vacuums about two or three times a month, but it wears her out. (Tr. 703.)

Plaintiff reported that she can hardly walk a block without having to sit down. (Tr. 704.)

Plaintiff reported that she has been on steroids for quite a while, which has caused her weight to increase by 150 pounds over a four-to-five month period. (Tr. 706.) Her usual weight was 125-135 pounds, and at the time of the hearing she weighed 252 pounds. (Tr. 709.)

Plaintiff reported that her memory is impaired as a result of the surgery. (Tr. 710.) She experienced difficulty in remembering how to get to work. (Tr. 711.) Her treating physician has told plaintiff that there is nothing she can do to improve her memory. (Tr. 712.)

21

Plaintiff reported being totally deaf in her right ear as a result of the 1998 surgery. (Tr. 712.)

Plaintiff reported that her vision gets blurry when she tries to read or concentrate for a long period of time. (Tr. 712.)

### Testimony of Regina F. Willoughby

Ms. Willoughby testified that she has known plaintiff since 1976, when she met her through school. (Tr. 722-23.) She sees plaintiff about every day. (Tr. 723.) Ms. Willoughby reported that plaintiff has problems with her memory and provided examples. (Tr. 723-24.) She opined that plaintiff's memory has gotten worse and provided an example. (Tr. 724.)

## 2. Second Administrative Hearing (February 25, 2004)

### Testimony of Pamela A. Lamb

Plaintiff testified at her second hearing on February 25, 2004. She testified she was born in 1963, and at the time was 40 years old. (Tr. 753.) She graduated high school and completed two to three years of college. (Tr. 753-754.) Plaintiff is right hand dominant. She stood 5' 2 ½ " tall and weighed 240 pounds. Plaintiff testified that she had weighed 300 pounds and attributed her weight loss to the discontinuation of steroidal medication. (Tr. 755.) Plaintiff lived with her mother who moved in with her in 1996. (Tr. 786.) Her mother has Alzheimer's Disease and has a home health aide who comes to the home five days weekly, eight hours daily to provide assistance. (Tr. 778.)

Plaintiff testified that she taught daycare for three and a half years. She resigned this position in 1994 to work for the police department. (Tr. 763.) Plaintiff worked for the police department from June 1994 until April 21, 2000. (Tr. 766.) During her employment there were three breaks of employment. The first one occurred in June 1998 in anticipation of surgery in July 1998; she was off again in September or October 1998 for about three months; and finally returned to work on limited duty. Limited duty work included answering telephones. (Tr. 767.) she worked until June 1999, and was off again because she had to undergo a resection[44] on her brain in July 1999. Plaintiff returned to work in March 2000. (Tr. 767-768.) She finally resigned in April 2000 because she was unable to perform aspects of the job including data input, typing and dealing with people via the telephone. (Tr. 768-769.) Plaintiff testified she could not even answer telephones because of deafness in her right ear. (Tr. 769.)

Plaintiff testified about her impairments and resultant limitations. She experiences carpal tunnel syndrome in both hands. (Tr. 763.) The carpal tunnel syndrome is more severe in the right hand and plaintiff wears wrist splints nightly. She developed carpal tunnel syndrome following her brain surgeries in January 2001. (Tr. 764, 784.) Plaintiff experiences ongoing

---

[44]Resection is the surgical removal of tissue.

Case 4:04-cv-00750-REL   Document 17   Filed 09/20/05   Page 22 of 32

headaches. Associated symptoms include blurred vision, light and noise sensitivity and sometimes nausea or vomiting. (Tr. 770-771.) Plaintiff takes Excedrin for her migraines. She was previously prescribed Neurontin and Phenobarbital. These medications either caused an allergic reaction or drowsiness. (Tr. 772.) Lying down or using ice packs or Bio-Freeze also provide some headache relief. (Tr. 773.) Her headaches increase with stress. (Tr. 771.) Plaintiff also underwent three surgical procedures related to a brain tumor. The last procedure occurred in January 2000 when a shunt[45] was inserted to relieve fluid off her brain. Plaintiff testified the doctors were unable to remove all of the tumor because if its location. (Tr. 773-774.) Her eyesight diminished following surgery. (Tr. 775.) She sustained optic disc swelling in the right eye. (Tr. 792.) She has problems driving and reading signs from a distance. (Tr. 777.) She also suffers double vision peripherally. (Tr. 792.) Plaintiff also testified that Bell's palsy on the right side developed from her brain tumor. (Tr. 779.) She further sustain hearing loss in her right ear following her first surgery in July 1998. (Tr. 767, 769.)

Plaintiff also suffers irritable bowel syndrome with constant diarrhea. (Tr. 779-780.) She testified that she spends 99% of the time in the bathroom especially after eating and developing diarrhea. (Tr. 780.) Plaintiff testified that the night prior to the hearing, she went to the bathroom at least six times and spent 30 minutes to an hour in the bathroom each time. (Tr. 781.)

Plaintiff was born with asthma. She takes Singulair[46], a Ventolin[47] inhaler, and uses a machine to control her symptoms. She testified she was last hospitalized for asthma in the 1980's and there had been no emergency room treatments within the last year. Plaintiff felt her asthma symptoms were adequately controlled with medication. (Tr. 782-783.)

Plaintiff fell in ice in January 2000 and hurt her lower back and tailbone. She sees a chiropractor for treatment. (Tr. 783.)

Plaintiff experiences problems with long and short term memory. The problem became noticeable after her surgeries. (Tr. 784-785.) She also gets lost when driving. (Tr. 785.) Plaintiff was not currently seeing a mental health professional but consulted with one previously at the recommendation of her neurologist who felt her headaches were possibly linked to depression. (Tr. 785-786.)

Plaintiff testified to a variety of severe symptoms including memory deficits, migraine headaches, hearing loss, blurred vision, and diarrhea since 1998. (Tr. 789-792.) Plaintiff

---

[45]Plaintiff had a VD shunt, which is a procedure used to relieve intracranial pressure caused by hydrocephalus.

[46]Singulair (montelukast) is used to prevent asthma attacks.

[47]Ventolin (albuterol) inhaler is a muscle relaxer used to treat asthma, bronchitis, and emphysema.

23

testified that, with respect to her diarrhea, she was able to return to work on a full-time basis as long as she skipped lunch and used over-the-counter Immodium. (Tr. 793.)

Plaintiff testified that the severity of her memory problems, migraine headaches, and hearing loss had not changed since 1998. (Tr. 790.) Plaintiff testified that she used only over-the-counter Excedrin for migraines to treat her migraine headaches. (Tr. 791)

Plaintiff testified about additional limitations as result of her impairments. She cannot talk on the telephone and listen to someone else simultaneously because of hearing loss in her right ear. (Tr. 775.) Because of fatigue, plaintiff can only walk half a block. (Tr. 783.) Standing is limited to a couple of hours and she is unable to squat because her legs give out. She sits in a recliner with legs elevated to at least waist level. (Tr. 784.) Vacuuming wears her out. (Tr. 786.) Because of an inability to sleep at night -- she averages about three and a half hours of sleep nightly -- plaintiff naps during the day. She naps everyday for about an hour to an hour and a half. (Tr. 789.)

Plaintiff testified that she could drive an automobile and drove to places including her doctor appointments, the grocery store, and occasionally drove to pick her nephew up from daycare. (Tr. 777, 788-89.) She further testified that she performed the household chores, but that vacuuming tired her a great deal. (Tr. 786.) Plaintiff also testified that she cared for her mother who lived with her and had Alzheimer's and a brain tumor. (Tr. 778-79, 786.) Plaintiff testified that she fed, clothed and bathed her mother, and that a friend and a niece occasionally helped her out. (Tr. 792-93.)

### Testimony of Vocational Expert

Amy Salva, a vocational expert (VE) , appeared and testified at the request of the ALJ. The VE listed and classified plaintiff's past relevant work as switchboard operator, sedentary and semiskilled; property clerk, light and semiskilled; receptionist, sedentary and semiskilled; daycare worker, light and semiskilled; and cashier, light and unskilled. (Tr. 798.) The VE responded to the following hypothetical question from the ALJ:

> Let's take a 40-year-old lady with three years of college, 106 hours, certificate from an airline school that gave her skills to write airline tickets, who could do the full range of sedentary work with the following exceptions: Because of her asthma, she can be in no extremes of hot and cold and she has to be in a controlled humidity. She has to be in no job that requires hearing from the right side because she's deaf in that ear and because of the headaches that she has, we're not going to put her in any bright lights because she said that makes her headaches worse, no unprotected heights, no dangerous or moving machinery and it has to be a job that requires no acute, peripheral vision because she says when she looks to either side or looks up, she sees double so, whatever job, it has to vision that requires straight on looking ... And, because of asthma again, she's got to work in an environment that's relatively free of dust, smoke and noxious odors. She can do occasional squatting and kneeling but no crawling. It has to be in low stress, simple, repetitive environment with a sit/stand option and, in case she wants to [eat] lunch, it has

24

to be near a toilet facility. Based on that hypothetical, Ms. Salva, in your opinion, can you identify any job that a person with this hypothetical profile can perform eight hours a day, five days a week, on a sustained basis? No part-time jobs, no one day week jobs, cleaning up the post office – eight hours a day, five days a week?

(Tr. 798-799.)

The VE testified such a person could perform several jobs including surveillance systems monitor, cashier, and information clerk. (Tr. 800.)

Plaintiff's attorney asked the VE to consider other limitations including the need to lie down due to either fatigue or pain for an hour to an hour and a half and the need to elevate the legs to waist level. (Tr. 801.) With these restrictions, the VE testified such a person would not be able to maintain employment. (Tr. 801.)

### D. FINDINGS OF THE ALJ

On March 15, 2004, the ALJ entered his order denying plaintiff's request for benefits. (Tr. 22-31.) In that order the ALJ declined to reopen the plaintiff's November 19, 1999, application for disability benefits. (Tr. 23.)

The ALJ found that although plaintiff had worked briefly after her alleged onset date of June 30, 1999, such employment "represent[ed] an unsuccessful work attempt of short duration, and overall, not presumptive of substantial gainful activity pursuant to the regulations." (Tr. 23.)

The ALJ acknowledged that plaintiff has the following severe impairments: history of epidermoid tumor resulting in right hearing loss, right cranial nerve seven palsy and complaints of migraines, status post craniotomy in July 1998, for removal of an epidermoid cyst, right subtemporal craniotomy with resection of epidermoid in July 1999, and placement of right frontal ventriculoperitoneal shunt in January 2000; low average intelligence and memory functioning possibly secondary to history of multiple brain surgeries; bilateral chronic optic nerve edema secondary to history of dermoid cyst in the brain; history of asthma; mild bilateral carpal tunnel syndrome; and mild degenerative changes in the lumbar spine. (Tr. 24.)

The ALJ then went into the *Polaski* factors. On plaintiff's work history, the ALJ found that plaintiff enjoyed a "fairly stable work history but concluded that her brief return to work in 2000, although not presumptive of substantial gainful employment, was "relevant" to her ability to work. (Tr. 25.)

As to her daily activities, the ALJ observed that plaintiff could drive a car, make it to her medical appointments, shop, and occasionally pick up her nephew from daycare; that she could do housework, although it was fatiguing; and that she cares for her mother who suffers from Alzheimer's Disease and a brain tumor. (Tr. 25.) Based largely on plaintiff's ability to care for her mother, the ALJ concluded that her claim of debilitating medical condition was inconsistent with the record. (Tr. 25-26.)

25

As to symptoms, the ALJ observed that plaintiff "testified to a variety of severe symptoms including memory deficits, migraines, hearing loss, blurred vision, and diarrhea since 1998, [but] she noted that she was able to return to work on a full-time basis in 1999" by skipping lunch and taking over-the-counter Imodium. (Tr. 26.) The ALJ dismissed these complaints because plaintiff "noted that she relied on over-the-counter Excedrin for migraines, and with respect to her visual problems, [plaintiff] noted that she had no problems with double vision when she looked straight on." (Tr. 26.) The ALJ observed that the record does not show disabling symptoms because:

> The K.U. Medical Center records show "[plaintiff's] vision was only occasionally blurry, with double vision,"

> "[T]here is no mention of debilitating fatigue on the part of [plaintiff] on those treatment records," and

> Plaintiff was released to return to work in March 2000 by her surgeon.

(Tr. 27.)

The ALJ found that plaintiff does not have disabling mental impairments based on the review conducted by Robert Pulcher, Ph.D. (Tr. 26.)

As to the opinions of plaintiff's treating physicians, the ALJ acknowledged that Paul L. O'Boynick, M.D. in December 2000 reported that plaintiff would have ongoing problems as a result of her brain tumor and surgeries, and that it would be difficult for her to work full-time because of her vision and headaches, and that Dr. Mann, in January 2004, assessed "some rather significant functional limitations on [plaintiff], all of which would preclude even sedentary work." (Tr. 28.) However, the ALJ discounted Dr. O'Boynick's opinion as dated, unsupported by the medical records, and uncorroborated by plaintiff's demonstrated level of functioning. (Tr. 28.)

Based on these findings, the ALJ concluded that plaintiff could perform sedentary entry-level work, and therefore is not disabled under the Act. (Tr. 29-31.)

## V. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d at 1322. The ALJ, however, must make express credibility determinations and set forth the inconsistencies which

Case 4:04-cv-00750-REL   Document 17   Filed 09/20/05   Page 26 of 32

led to his or her conclusions. <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is not supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. <u>Polaski v. Heckler</u>, 739 at 1322.

## 1. PRIOR WORK RECORD

Plaintiff enjoyed a good work record from at least 1977 to 1999, a period of more than 20 years. The ALJ recognized this positive factor but then dismissed it because plaintiff attempted unsuccessfully to return to her job at the police department in 2000. Instead he concluded that her failed efforts actually reflected a capacity to work.

In an affidavit submitted by the police department, plaintiff's supervisor said that the department tried to accommodate plaintiff by allowing her a one-half hour break every two hours and allowing her to leave work due to health problems; yet in spite of these accommodations, plaintiff was unable to perform even this limited duty.

The psychologist, Robert Pulcher, Ph.D., who examined and tested plaintiff at the request of the state agency opined that plaintiff has "a strong work ethic and reported being anxious to return to full time as soon as possible."

It seems counterintuitive to say that this failed attempt to return to work is evidence of the capacity *to* work. Rather it seems that this factor supports plaintiff's credibility as it indicates that she wanted to return to work, tried as hard as she could to return to work, but simply could not. More importantly, the ALJ failed to accredit plaintiff's testimony based on her 22 years of productive employment. This was error.

Plaintiff's significant work history supports her credibility.

## 2. DAILY ACTIVITIES

Plaintiff testified that her daily activities are limited to caring for her aged and ailing mother, driving to medical appointments, shopping for groceries, performing some essential housework, and attending church.

27

The ALJ concluded that plaintiff's caring for her mother, an 80-year old invalid suffering from Alzheimer's Disease, was evidence that she could be gainfully employed.

The medical records contain one entry relevant to plaintiff's care of her mother: On January 13, 2003, plaintiff went to see Dr. Mann with a back strain suffered when she picked up her mother who had fallen; plaintiff was assessed as having acute lumbar strain.

More importantly, plaintiff testified that her mother has a home health aide who comes to the home five days weekly, eight hours daily to provide assistance. Therefore, the ALJ's assertion that plaintiff's "taking care of her mother" is evidence that she can work full time is unsupported by the record.

The fact that plaintiff does some basic care and feeding of her mother, who is attended to by a home-health care worker from the Division of Aging, is not evidence of an ability to perform gainful employment. Plaintiff lives with her mother and lives off her mother's Social Security retirement income. It is not surprising that she does some basic "care giving" to a family member living under the same roof. However, it is inconceivable that she should be denied Social Security benefits because she feeds, sponge-bathes and shops with her mother. These activities are inconsequential and do not demonstrate an ability to perform meaningful work, 40 hours a week, in the regional or national economy.

This factor is added to plaintiff's credibility determination.

### 3.  DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff testified to a myriad of symptoms including fatigue, nausea, dizziness, memory loss, migraines, hearing loss, blurred and double vision, and irritable bowel syndrome.

The ALJ discounted migraines because plaintiff only takes over-the-counter medication; discounted the vision problem because plaintiff does not experience double vision when she looks "straight on"; and discounted the fatigue allegation because there is no mention of debilitating fatigue in the medical records and plaintiff was released back to work in 2000 by her surgeon.

Plaintiff's disabling memory loss was corroborated by the third-party witnesses Tracy Down Welch and Connie Peterson. In addition, Regina F. Willoughby appeared at the first administrative hearing and provided examples from personal experience of plaintiff's memory-loss problems.

Plaintiff memory problems are set forth in the medical records. For example, on July 8, 1999, KU Medical Center observed that her memory was decreased but improving with care; on September 22, 1999, plaintiff complained at KU of increased memory loss; on January 4, 2000, plaintiff complained of memory loss while at KU; and on February 29, 2000, the psychology consultant performed tests that confirmed a problem with plaintiff's memory.

28

Plaintiff's vision problems include double and blurred vision, often referred to as "diplopia," resulting from her brain surgeries. There are numerous examples of plaintiff's recurring problems with vision throughout the medical records including: September 14, 1998; October 5, 1998; January 17, 1999; January 26, 1999; February 23, 1999; March 23, 1999; April 27, 1999; June 9, 1999; September 14, 1999; July 25, 2001; January 11, 2002; and February 3, 2003.

On fatigue, plaintiff testified that she can only walk a block before she experiences fatigue; and the medical records show the plaintiff complaining of fatigue on January 27, 1999 ("malaise"); March 10, 1999; March 23, 1999; September 22, 1999; April 19, 2000 (overwhelming fatigue); October 4, 2000; and June 22, 2001. Therefore, it is somewhat inaccurate for the ALJ to observe that the medical records do not contain evidence of "debilitating fatigue."

On headaches and migraines, plaintiff complained on numerous occasions including: May 15, 1998; June 15, 1998; January 17, 1999; January 27, 1999; January 28, 1999 ("headache with dizziness"); February 3, 1999; March 10, 1999; March 23, 1999; April 14, 1999; May 12, 1999; June 9, 1999 ("headache with double vision); July 8, 1999; August 9, 1999 ("headache with nausea"); August 25, 1999 ("headache would not go away"); August 27, 1999 ("headache with nausea"); August 31, 1999; November 9, 1999 ("constant headache"); January 4, 2000 ("headache and memory loss"); February 23, 2000 ("possible migraine headache"); March 8, 2000 ("recurrent headaches with double vision"); April 19, 2000; September 5, 2000; December 6, 2000; April 2, 2001; June 26, 2001 ("persistent headaches"); September 28, 2001 ("headaches and eye strain"); December 10, 2001 ("headaches never resolved"); and February 3, 2003 ("complaints of continuing headaches"). Plaintiff also stated that she did not always seek medical treatment for her headaches because she could not afford to. With this record, I find the ALJ erred by discounting plaintiff's headache complaints because she was taking over-the-counter medication to treat them.

Overall, there is substantial evidence corroborating plaintiff's allegations of disabling symptoms, and therefore this factor supports plaintiff's credibility.

## 4. PRECIPITATING AND AGGRAVATING FACTORS

Although the ALJ did not specifically deal with precipitating and aggravating circumstances, there is evidence in the record that shows plaintiff's symptoms are brought on or increased by two factors: increased stress and overuse of her eyes.

In her last employment, these problems led the police department to accommodate plaintiff by changing her job to one that was less stressful and reducing her workload by allowing for regular and lengthy breaks every two hours. Neither accommodation worked.

Again, this factor supports plaintiff's credibility.

29

## 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

Plaintiff does mention  problems with her medication including the use of more than the recommended dosage of over-the-counter headache medication, and the side effects of steroids.

The ALJ took notice of plaintiff's failure to take prescription pain relief medication and discounted her complaints of disabling pain based on this factor.  The ALJ erred in this determination, because plaintiff was regularly prescribed more powerful pain relievers. Her reasons for not being on a regular regiment of painkillers are unclear, but many reasonable inferences may be drawn by way of explanation, including (1) they may have interfered with her ability to function at all (e.g., April 19, 2000, Elavil caused plaintiff overwhelming fatigue); (2) they may have been too expensive for a person living off her mother's Social Security checks; and (3) they may have interfered with her other medical conditions, most obviously the results of her three brain surgeries.  If this was a concern, the ALJ should have asked plaintiff about the reasons for not taking prescription pain relievers at the administrative hearing.

The medical records confirm problems with plaintiff's medications as follows: On May 15, 1998, plaintiff reported taking 6-8 Aleve daily for many years at a dose above the recommended level; on July 7, 1998, plaintiff was given various anti-emetics[48] with very little effect; on February 3, 1999, plaintiff was recommended for treatment of pain relief; on November 9, 1999, plaintiff was instructed by the ophthalmology clinic to alleviate the need for further steroid use; on January 26, 2000, plaintiff's medication failed to relieve her hand pain; on February, 23, 2000, the examining psychologist noted that plaintiff had suffered some side-effects from steroids; on March 8, 2000, plaintiff showed significant weight gain from use of cortisone; on April 19, 2000, plaintiff's physician prescribed Nortriptyline because of "intolerable side effects with Amitriptyline [Elavil];" December 10, 2001, the neurological people at KU Medical Center instructed plaintiff to continue taking "Advil"; and on June 25, 2002, Dr. Mann observed that plaintiff was taking more ibuprofen than usual.

There are several entries in the record corroborating plaintiff's difficulties with weight presumably as a result of her continued steroid treatment: April 14, 1999, plaintiff had weight gain; March 8, 2000, plaintiff reported significant weight gain from cortisone; July 25, 2001, plaintiff found to be overweight; January 13, 2003, plaintiff markedly overweight; and August 1, 2003, plaintiff was still overweight.

The record seems to suggest that her problems with steroids have been resolved but the headaches continue to be disabling.  This factor weighs in favor of plaintiff's credibility.

## 6. FUNCTIONAL RESTRICTIONS

In the March 8, 2000, letter from Craig S. Lofgreen, M.D., to the Kansas City Police Department, the doctor opines that plaintiff may tolerate some degree of data entry work with an

---

[48]Anti-emetics are anti-vomiting medications.

Case 4:04-cv-00750-REL   Document 17   Filed 09/20/05   Page 30 of 32

alternative non-data enyrt activity for 30 minutes out of every two-hour period. This restriction ultimately failed, and plaintiff decided to resign her position at the police department because she was unable to perform limited duties even with this generous restriction in place.

On April 17, 2000, a family nurse practitioner instructed plaintiff to stand periodically and ambulate during the work day to relieve pain.

In a January 22, 2004, Physician's Source Statement, Dr. Mann opined that plaintiff could lift and carry less than 10 pounds; could stand and walk less than 2 hours; could sit less than 6 hours; and could reach, handle and finger without limitation.

## B. CREDIBILITY CONCLUSION

Having reviewed the *Polaski* factors, I find that all six support plaintiff's credibility and therefore the ALJ erred in finding plaintiff not credible.

Plaintiff's motion for summary judgment will be granted on this basis.

## VI. TREATING PHYSICIAN'S OPINION

Plaintiff also argues that the ALJ failed to give proper deference to the opinion of her treating physician, Paul L. O'Boynick, M.D.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

Dr. O'Boynick opined in a December 6, 2000, letter, that plaintiff's hydrocephalus will be an ongoing problem and it will make it difficult for her to work full time because of visual difficulty and headaches. The doctor concluded that plaintiff's condition will not improve with time or treatment.

I agree that the ALJ failed to give this treating source adequate deference. While the letter is "dated" as the ALJ observed, there is nothing in the subsequent medical records to reflect that plaintiff's condition has improved since December 6, 2000. Indeed, there is substantial evidence that her condition has in fact declined.

Case 4:04-cv-00750-REL   Document 17   Filed 09/20/05   Page 31 of 32

I find that the ALJ erred in discrediting the opinion of Dr. O'Boynick. Therefore, plaintiff's motion for summary judgment on this basis will be granted.

## VII. SEDENTARY WORK

Finally, plaintiff argues that the ALJ erred in deciding that plaintiff could work at sedentary jobs (e.g., surveillance systems operator, information clerk, and cashier) with restrictions for her asthma condition, her deaf right ear, her visual problems, her orthopedic problems, and her cognitive deficits.

A vocational expert's testimony constitutes "substantial evidence" only if that testimony is based on a proper hypothetical, and a hypothetical is proper only if it includes all of the claimant's relevant impairments. Brachtel v. Apfel, 132 F.3d 417, 419 (8th Cir. 1997); Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996). If the hypothetical does not relate all of a claimant's impairments, the resulting testimony of the vocational expert cannot constitute substantial evidence to support the ALJ's decision. Brachtel v. Apfel, 132 F.3d at 419; Ekeland v. Bowen, 899 F.2d 719, 722 (8th Cir. 1990).

During counsel's examination, the vocational expert was asked whether the jobs of surveillance systems operator, information clerk, and cashier would be available to someone who would have to elevate her leg throughout the day or lie down for an hour to an hour and a half each day. The expert opined that no jobs would be available for the hypothetical person with these additional restrictions.

As discussed at length above, the ALJ erred in discrediting plaintiff's testimony regarding these impairments. Because the hypothetical relied on by the ALJ did not include all of plaintiff's credible impairments, the vocational expert's testimony cannot support the ALJ's decision. Therefore, plaintiff's motion for summary judgment on this basis will be granted.

## VIII. CONCLUSIONS

Based on all of the above, I find that the ALJ erred in discrediting plaintiff, in discrediting the opinion of her treating physician, and in finding that plaintiff can perform other work in the economy. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits.

_____/s/_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 20, 2005

Case 4:04-cv-00750-REL   Document 17   Filed 09/20/05   Page 32 of 32